UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOI RICHARDS,

                                                                                    Civil Case No. 22-cv-13014

      Plaintiff,

v.                                                              HON. MARK A. GOLDSMITH

COMMUNITY CHOICE CREDIT UNION,

      Defendant.

_____/

**OPINION & ORDER
DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (Dkt. 14)**

Plaintiff Joi Richards filed this lawsuit alleging retaliation under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 28, and racial discrimination and retaliation based on sex in violation of the Michigan Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. L. § 37.2101, et seq., after her employment was terminated by Defendant Community Choice Credit Union (CCCU). Before the Court is CCCU's motion for summary judgment (Dkt. 14). For the reasons that follow, the Court denies in part and grants in part CCCU's motion.[1]

**I. BACKGROUND**

Richards was a lending specialist at CCCU from February 2019 until her termination in October 2022. Br. Supp. Mot. for Summ. J. at 1; Resp. at 5. Richards asserts that she was terminated after she complained of racial harassment and applied for leave under the FMLA. Resp.

---

[1] Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b). In addition to the motion, the briefing includes Richards's response (Dkt. 17) and CCCU's reply (Dkt. 19).

at 5. Richards's claims are based on several instances of alleged harassment that occurred throughout her employment at CCCU.

On February 7, 2020, Richards, her co-worker Chauncia[2]—who is also Black—and CCCU's assistant lending manager Mike Marquette, were discussing an issue they were having with a CCCU computer. Br. Supp. Mot. for Summ. J. at 2 (citing Richards Dep. at PageID.613 (Dkt. 17)).[3] Richards asked a third co-worker, Kelly Lenard, to assist with the computer issue. After Lenard fixed the computer issue, Lenard said to Richards, Chauncia, and Mike: "Joi's going to take you out back for a lynching." Id. Richards asserts that the comment was "in regards to [Richards and Chauncia, as Black women] not being able to fix the issue with the computer." Richards Dep. at PageID.613.

Later that evening, Richards emailed Marquette and requested that Lenard be educated about her use of the word "lynching" and the "tremendous murderous pain and agony" that is associated with the term "[s]o that she will never laugh [at the term] again." 2/7/2020 Email at PageID.377 (Dkt. 14). Marquette replied, stating that he was "sorry [Richards] had to hear it, and [that he] was surprised to hear [Lenard] say it." Id. at PageID.376. Marquette added that CCCU "will take appropriate measures" and that he "planned to discuss with [CCCU's lending operations manager Janet Robert]" the following Monday. Id. Richards thanked Marquette for his response and noted that she did not "want anything to happen to [Lenard]" other than the incident should be used as a "coaching a[nd] teaching moment." Id.

---

[2] Because the parties have not identified Chauncia's last name in their briefing or the discovery record, the Court refers to her by her first name.

[3] The parties' exhibits are attached to their summary judgment briefs.

An investigation was conducted by CCCU's assistant vice president of human resources, Cheryl Duncan. Duncan Dep. at PageID.431 (Dkt. 14). Its conclusions led to CCCU disciplining Lenard with a three-day unpaid suspension and training on diversity, equity, and inclusion. Id.; 2/18/2020 Disciplinary Action Form at PageID.390 (Dkt. 14).

Richards also alleges that, on the same day that Lenard used the term "lynching," an unidentified employee from another department whose name Richards did not know "randomly came up to" Richards and another Black woman in CCCU's parking lot and said "Fo shizzle my nizzle," a phrase which Richards submits includes the N-word in Ebonics. Richards Dep. at PageID.615–616. Richards says she reported the comment to Duncan and CCCU's Chief Human Resource and Marketing Officer, Donna Siejutt, but that they did not investigate further. Id.

In addition to the February 2020 incidents, Richards alleges that she endured several other instances of racial harassment during her tenure, including two instances in which CCCU employees referred to Black people as "ghetto." Richards Dep. at PageID.617–619. Richards also alleges that another co-worker, Greg Brackett, made fun of another black co-worker's baby's name. Richards Dep. at PageID.619. She also maintains that several employees touched her hair at some point during her tenure at CCCU. Id. at PageID.620.

Richards's complaint also includes allegations of retaliation for her reporting of racial harassment and her intermittent-medical leave under the FMLA. Compl. ¶¶ 53–59 (Dkt. 1-1). Richards was approved for intermittent leave on March 10, 2022, with an effective date of February 28, 2022. 3/10/22 Letter at PageID.397 (Dkt. 14).[4] Later that summer, and following a review of Richards's performance, CCCU placed Richards on a performance improvement plan

---

[4] Richards's response asserts that her FMLA leave began in January 2022. Robert confirmed that Richards's leave was "probably about January 2022." Robert Dep. at PageID.414 (Dkt. 14).

3

on August 24, 2022. Br. Supp. Mot. for Summ. J. at 6–7; Resp. at 7. On September 28, 2022, Richards's plan was extended and she was expected to remain on the plan until October 28, 2022. Performance Improvement Plan at PageID.519 (Dkt. 14).

According to Richards, on September 28, 2022, when attempting to log in to her computer, she experienced a "firewall" that prevented her from accessing CCCU's systems. Richards Dep. at PageID.644. When she asked her supervisor Michael Marquette for assistance, he purportedly told her to print a 142-page document containing confidential membership information "as a test" and to send it to her personal email address. Resp. at 8; Richards Dep. at PageID.607. CCCU submits that Richards, by sending materials containing confidential member information to her personal email address and to CCCU's printer, violated its confidentiality and "Clean Desk" policies. Br. Supp. Mot. for Summ. J. at 7–8.[5]

Richards was terminated on October 11, 2022. 10/11/22 Termination Letter at PageID.202 (Dkt. 14); Resp. at 8–9; Br. Supp. Mot. for Summ. J. at 7–8. CCCU submits Richards was terminated because she violated CCCU's confidentiality policies. Br. Supp. Mot. for Summ. J. at 8; 10/11/22 Termination Letter at PageID.202. Richards maintains that she printed and emailed the document at the direction of her supervisor, and that the alleged violation of CCCU's confidentiality policy was an "excuse" to fire her. Resp. at 9, 18.

---

[5] CCCU's "Clean Desk" policy prohibits employees from "[l]eaving out personal, team member or member confidential information on [an employee's] desk/office." CCCU Handbook at PageID.326 (Dkt. 14). CCCU's confidentiality policy provides in part that "[i]nformation, files, documents, records, plans, and other material relating to the Credit Union, its Team Members, and members are confidential. The Credit Union's general business affairs should not be discussed with anyone outside the organization except as required in the normal course of business. Inappropriate release of confidential information, either internally or externally, will result in disciplinary action, up to and including termination. . . . Any Team Member who violates this policy will be subject to disciplinary action, up to and including termination." Id. at PageID.323–324.

## II. ANALYSIS[6]

### A. FMLA

The FMLA prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). To establish a prima facie case of FMLA retaliation, Richards must show that

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

Donald v. Sybra, Inc., 667 F.3d 757, 761 (6th Cir. 2012). "When an FMLA retaliation claim is based on indirect evidence, the McDonnell-Douglas burden-shifting analysis applies." LaBelle v. Cleveland Cliffs, Inc., 784 F. App'x 437, 443 (6th Cir. 2019). "At this stage, the burden of proof is 'minimal,' as all [Richards] must do is put forth some credible evidence that enables the [C]ourt to deduce that there is a causal connection between the retaliatory action and the protected activity." Id. (punctuation modified). "If [Richards] establishes a prima facie case, [she] raises a presumption of discrimination. The burden then shifts to [CCCU] to articulate a nondiscriminatory basis for the adverse action and thus rebut the presumption." Id. (punctuation modified).

If CCCU articulates a nondiscriminatory reason for its actions, the burden shifts back to Richards to show that CCCU's justification is pretext for retaliation. See id. Richards "may show

---

[6] The Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can only survive summary judgment by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986).

5

pretext by showing that the proffered reason (1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action." Id.

The Court finds that Richards has established a prima facie case of retaliation. Specifically, she has offered evidence that she was placed on a performance improvement plan and eventually terminated after engaging in the protected activity of taking intermittent leave under the FMLA. See Resp. at 19. Moreover, Richards points to a text from Robert who, after receiving a complaint from one of Richards's co-workers, Greg Brackett, about Richards's performance, responded by saying:

> Hi I just seen the email from Greg. Why didn't they share this feedback as it went along? Please get with Devin and Barb. Take her off credit cards right away. This needs to be shared with HR that she is not focused and causing a risk in the credit card area. She needs to be on FMLA full time or fired.

6/2/22 Text Message at PageID.455. Although CCCU submits that Robert was disciplined for the text and required to complete training as a result, Br. Supp. Mot. for Summ. J. at 16, the text is sufficient evidence for the Court to deduce that there as a causal connection between the retaliatory action and the protected activity. LaBelle, 784 F. App'x at 443.

Because Richards has met her minimal burden of establishing a prima facie case, CCCU has the burden of establishing a nondiscriminatory basis for Richards's termination. CCCU points to evidence that it only fired Richards after she violated CCCU's confidentiality policy by emailing member account information to her private email address and printing that same document. In response, Richards argues that the policy violation was pretext because she was instructed by her supervisor, Marquette, to send the documents to her personal email and to the printer in violation of CCCU's confidentiality policy while she was unable to access CCCU's system. Resp. at 19–20.

6

CCCU argues that Richards's view is false. It argues that the file containing the confidential information—"Binder 2"—was created, emailed, and sent to print by Richards well after her computer issue was resolved. Br. Supp. Mot. for Summ. J. at 10. CCCU provides the timeline of events the day Richards sent Binder 2 to her personal email:

> On September 28, 2022, [Richards] was scheduled to begin work in the office at 2 PM. When she arrived, she could not log into her computer. . . . At 2:32 PM, Plaintiff sent this email to her co-workers: "My internet is back and I am up and running now". The CCCU computer network records indicate at 3:16 PM, Plaintiff created "Binder 2" (the 142-page bulk document); and at 3:18 PM, she sent "Binder 2" to her personal email account.

Id. at 8–9 (punctuation modified, emphasis omitted).[7] CCCU also points to testimony from Marquette, who denied advising Richards how to resolve the issue other than suggesting she request help from CCCU's IT department. Marquette Dep. at PageID.387.

Richards disputes CCCU's timeline. She testified in her deposition that Marquette directed her to send the email attaching Binder 2 before her access to CCCU's computer system was restored, and that the "email ultimately did send once system access was restored, around 3:18 pm." Resp. at 8. While Richards acknowledges that regained access to CCCU's system at 2:32 p.m., she explains that the employees at CCCU have "had stuff in the lending department where we printed, sent it to the printer in the morning and it didn't print until the afternoon." Richards

---

[7] CCCU points to several "CCCU computer network records" to support this timeline. Br. Supp. Mot. for Summ. J. at 9. It cites a screenshot of "Binder2 Properties" purportedly showing that the document was created at 3:16 p.m., see Binder2 Properties Screenshot at PageID.523 (Dkt. 14), and a screenshot of an email from Richards's CCCU email address to her personal address at 3:18 p.m. See Screenshot of Email at PageID.525 (Dkt. 14). CCCU has failed to authenticate these documents with an affidavit or declaration signed by a witness with personal knowledge of their contents. "[U]nauthenticated documents do not meet the requirements of Rule 56(e)." Alexander v. CareSource, 576 F.3d 551, 558 (6th Cir. 2009). However, as discussed below, the Court finds that Richards has raised an issue of fact even if these documents are considered.

7

Dep. at PageID.601. Richards submits that the same delay often happened when sending emails. Id.

The conflicting evidence recounted above shows that there is a fact issue regarding whether Richards was directed by her supervisor to violate CCCU's policies by sending confidential member information to her personal email address and CCCU's printer. Because a jury must decide whether Richards was in fact ordered by her supervisor to violate CCCU's policy, for summary judgment purposes, Richards has carried her burden of showing that CCCU's stated reason for her termination is pretextual. Such fact issues preclude summary judgment on her FMLA retaliation claim.

### B. ELCRA

The ELCRA provides that employers shall not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . race." Mich. Comp. L. § 37.2202(1)(a). The Act also "prohibits retaliation where a party lodges a charge or a complaint about a violation of the [EL]CRA." Jones v. FCA U.S. LLC, No. 365920, 2024 WL 2985407, at *5 (Mich. Ct. App. June 13, 2024) (citing § 37.2701(a)). Richards asserts ELCRA claims of hostile work environment, retaliation, and discrimination. See Compl. ¶¶ 36–52. The Court addresses each theory in turn.

#### 1. Hostile Work Environment

Claims of alleged discrimination brought under the ELCRA are reviewed under the same standard as discrimination claims brought under Title VII. Beaver v. Macomb Cnty., No. 21-cv-10750, 2022 WL 839943, at *12 (E.D. Mich. Mar. 21, 2022). "To establish a prima facie case of hostile work environment based on . . . racial discrimination, a plaintiff must present sufficient

evidence to show that (1) she belongs to a protected group; (2) she was subjected to communication or conduct on the basis of race . . .; (3) the unwelcome conduct or communication was based on race . . .; (4) the unwelcome conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior." Id. (punctuation modified).

The parties do not dispute the first three elements—that Richards belongs to a protected group and was the subject of unwelcome conduct based on race. However, the parties do dispute the fourth element—whether Richards was subject to unwelcome conduct so severe that it created a hostile work environment—and the fifth element of respondeat superior, i.e. whether the company was on notice of the unwelcome conduct and failed to take appropriate action.

"In determining whether an actionable hostile work environment claim exists, [courts] look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Significantly, isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. Thus, occasional offensive utterances do not rise to the level required to create a hostile work environment . . . ." Phillips v. UAW Int'l, 854 F.3d 323, 327–328 (6th Cir. 2017) (punctuation modified) (analyzing plaintiff's hostile work environment claims under Title VII and the ELCRA).

Turning first to the severity of the conduct, Richards has identified several racially offensive incidents during her employment at CCCU. Specifically, Richards has produced evidence that (i) Lenard used the racially inflammatory term "lynching" in conversation with Richards and another black CCCU employee, see Richards Dep at PageID.613; 2/7/2020 Email at

9

PageID.376–377, (ii) a co-worker, Greg Brackett, allegedly made fun of another black co-worker's baby's name, Richards Dep. at PageID.619, (iii) an unidentified co-worker used the word "nizzle" while in the parking lot, id. at PageID.615, (iv) co-workers referred to Black people depicted on a social media video as "ghetto," id. at PageID.618, and (v) co-workers touched and commented about Richards's hair, id. at PageID.620. Richards testified that these incidents all occurred "at some point throughout her employment" in either 2020 or 2021. Id. at PageID.621.

The above incidents are far from isolated and occurred over a period of roughly two years. On this record, a jury could agree with Richards that harassment pervaded her employment at CCCU.

CCCU argues that Richards's hostile work environment claim also fails because she cannot show the fifth element of respondeat superior. Br. Supp. Mot. for Summ. J. at 21–22. "Respondeat superior liability can be imposed on an employer for an employee's hostile environment harassment only if the employer had reasonable notice of the harassment and failed to take appropriate corrective action." Henderson v. Walled Lake Consol. Sch., 469 F.3d 479, 489 (6th Cir. 2006) (punctuation modified).

Here, the evidence is mixed as to whether CCCU was sufficiently on notice of the hostile acts and whether it took appropriate action in response.

CCCU has put forth some evidence that it took corrective action in response to Richards's complaints. Specifically, after Richards notified her supervisor of Lenard's inappropriate use of the word "lynching" with Richards and another black co-worker, CCCU took corrective action by placing Lenard on a three-day unpaid suspension and requiring her to undergo training on diversity, equity, and inclusion.

Regarding Richards's allegation that Brackett criticized a Black co-worker's baby's name, there is evidence that Richards reported the incident to CCCU's human resources manager Kris Kramer. See Kramer Dep. at PageID.462 (Dkt. 14). However, while Richards maintains that Brackett made the comments in 2020 or 2021, she did not report this incident to Kramer until June 2022. See Richards Dep. at PageID.637; Kramer Dep. at PageID.461–462. And once informed of the allegation by Richards, there is evidence that Kramer confronted Brackett about the alleged comments and told him that "regardless if he made those comments or not, that we do not tolerate it and we do not expect to hear any other situations of him using discriminatory language." Kramer Dep. at PageID.462. Richards cites no evidence disputing Kramer's testimony.

CCCU further points to incidents that Richards reported but failed to provide sufficient information to allow follow-up by CCCU. Specifically, Richards could not identify the employee who used the word "nizzle." Richards Dep. at PageID.615. Nor could Richards identify the co-workers involved in the incidents related to Richards's hair. Id. at PageID.620–621 (Richards testifying that she did not know who was in the group making the offensive comments or who touched her hair); Duncan Dep. at PageID.434 (testifying that she was not informed by Richards about who touched Richards's hair).

Richards has presented evidence, however, that she reported some of the offensive conduct cited above and that CCCU failed to act. Although not entirely clear from her deposition transcript, Richards appears to testify to witnessing co-workers—a group that included colleagues named "Jess," "Kelly," and an unidentified third person—refer to Black people depicted on social media as "ghetto" on two separate occasions in 2021. Richards Dep. at PageID.617–618. Richards described one incident where she was not entirely sure of what the video these co-workers were watching, but she was sure that "they were looking at African Americans," and that the co-workers

11

referred to them as "ghetto." Id. at PageID.617. On another occasion, Richards alleges that the same co-workers watched a video of a Black woman "having a medical emergency" and that the co-workers laughed and called the woman ugly and ghetto. Id. at PageID.618. Richards testified that she reported both incidents to Marquette soon after they occurred and that CCCU took no action in response. Id. at PageID.617–618.

On this record, a reasonable jury could conclude that CCCU was aware of racist or offensive conduct at its workplace and failed to take appropriate action. To be sure, Richards did not adequately report every incident of offensive conduct and CCCU has provided evidence that it did take some action following at least two of Richards's complaints. However, given that Richards has supplied evidence (i) that some of her complaints went ignored by CCCU, and (ii) that the offensive conduct occurred on multiple occasions, a jury could find that CCCU "did not take measures reasonably calculated to end the harassment." Perkins v. Detroit Salt Co., No. 20-11211, 2021 WL 5989022, at (E.D. Mich. Dec. 17, 2021) (denying summary judgment on the plaintiff's hostile environment claim despite some evidence that employer took some remedial action in response to the plaintiff's complaints).

Because Richards provides evidence to show that she was subjected to a hostile work environment and that CCCU knew and failed to take appropriate corrective action, CCCU is not entitled to summary judgment on this claim.

**2. Retaliation**

"[T]o establish a prima facie case of retaliation under . . . [the] ELCRA [a plaintiff must show]: (1) she engaged in protected activity, (2) the defendant was aware of the protected activity, (3) the defendant took an action that was materially adverse to the plaintiff, and (4) there is a causal connection between the plaintiff's protected activity and the defendant's adverse action." Jackson

v. Genesee Cnty. Rd. Comm'n, 999 F.3d 333, 343–344 (6th Cir. 2021) (punctuation modified). Where, as is the case here, the "plaintiff relies on circumstantial evidence, her claims are evaluated using the burden-shifting framework of [McDonnell Douglas]."[8] Id. As discussed above, under McDonnell Douglas, if the plaintiff establishes her prima facie case, then the burden shifts to the defendant to demonstrate some "legitimate, nondiscriminatory reason" for its action. Id. "If the defendant produces such a reason, the burden shifts back to the plaintiff to show that the proffered reason was a mere pretext for discrimination. The ultimate burden, however, remains with the plaintiff to convince the factfinder that the defendant retaliated against her for engaging in protected activity." Id.

CCCU appears to argue that Richards did not engage in a protected activity by raising "general assertions" of discrimination. Br. Supp. Mot. for Summ. J. at 18 (comparing Richards's claim to Zyber v. Patsy Lou Buick GMC, Inc., No. 344628, 2019 WL 3849443, at *8 (Mich. Ct. App. Aug. 15, 2019), where the court dismissed an ELCRA retaliation claim premised on general assertions of unfair treatment).

"For a plaintiff to establish that he engaged in a protected activity, he [or she] must show that he took an overt stand against suspected illegal discriminatory action." Johnson v. Farmington Pub. Sch., No. 2:21-cv-12562, 2024 WL 1395140, at *18 (E.D. Mich. Mar. 31, 2024) (punctuation modified). As Richards points out (and as discussed above), Resp. at 16–17, Richards made

---

[8] Although the parties do not specifically address the issue of direct or circumstantial evidence, the Court finds that Richards has not supported her claim with any direct evidence of unlawful retaliation. "Direct evidence is that evidence which, if believed, requires no inferences to conclude that unlawful retaliation was a motivating factor in the employer's action." Jackson, 999 F.3d at 349. Here, Richards relies on inferences of unlawful retaliation based on her prior reporting of racially offensive conduct and her eventual termination.

13

multiple complaints of racial harassment. These complaints are sufficient to raise an issue of fact that Richards engaged in a protected activity.

CCCU also argues that Richards fails to show a causal connection between Richards's protected activity of reporting race-based harassment and her placement on the performance improvement plan and eventual termination. Br. Supp. Mot. for Summ. J. at 18–19. To meet this element of a prima facie ELCRA claim, "[a] plaintiff must show that the harm would not have occurred in the absence of—that is, but for—the defendant's conduct." Johnson, 2024 WL 1395140, at *21 (punctuation modified). Although the burden on a plaintiff at the prima facie stage "is not onerous," nor is it "nonexistant." Id.

A "temporal proximity [between the alleged protected activity and the adverse action] alone is generally not enough to establish the prima facie element of causation." Wingo v. Mich. Bell Tel. Co., 815 F. App'x 43, 46 (6th Cir. 2020). However, "[w]here an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." Robinson v. Quicken Loans, LLC, No. 21-1392, 2022 WL 4234072, at *7 (6th Cir. Sept. 14, 2022) (punctuation modified).

Here, the close temporal proximity of Richards's June 2022 complaint to Kramer about Brackett's comments about a co-worker's baby's name and Richards's placement on the performance improvement plan on August 24, 2022 and her eventual termination on October 11, 2022 is sufficient for a reasonable fact finder to infer a causal connection. For purposes of

14

summary judgment, Richards has met her burden of establishing the causation element of her prima facie case of retaliation under the ELCRA.

Because Richards has met her minimal burden of establishing a prima facie case, CCCU has the burden of providing a legitimate, non-discriminatory reason for its action. CCCU argues that its actions "were solely based on [Richards's] work performance and on her violation of [CCCU] policies." Br. Supp. Mot. at 19. With respect to Richards's performance, given the absence of performance issues prior to June 2022, a reasonable jury could find that CCCU's cited issues with Richards's performance is pretextual. Richards has met her slight burden of showing that CCCU's proffered motivations for taking adverse actions against Richards are pretextual. Jackson, 999 F.3d at 351 (explaining that a "plaintiff's burden is not heavy, and summary judgment is warranted only if no reasonable juror could conclude that the employer's offered reason was pretextual") (punctuation modified).

As to CCCU's assertion that Richards's termination was due to a violation of CCCU policies, Richards has raised an issue of fact as to whether this proffered reason is pretextual for the reasons discussed above. There is a conflict of evidence regarding whether Richards was directed by her supervisor to violate CCCU's policies by sending confidential member information to her personal email address and CCCU's printer. Because a jury must decide whether Richards was in fact ordered to violate CCCU's policy, for summary judgment purposes, Richards has carried her burden of showing that CCCU's stated reason for her termination is pretextual.

Because Richards has supplied evidence to raise an issue of fact regarding the existence of a causal connection between her complaints of racial harassment and her placement on a performance improvement plan and eventual termination, CCCU is not entitled to summary judgment on this claim.

### 3. Discrimination

Richards alleges that CCCU discriminated against her based on her race. Although Richards's summary judgment briefing does not further elaborate, her complaint asserts that she "was treated less favorably than similarly situated employees of [CCCU] who were not in the same protected class as Richards." Compl. ¶ 46.

"To establish an ELCRA discrimination claim using the McDonnell Douglas framework, a plaintiff is required to present evidence that (1) she was a member of a protected class, (2) she was subject to an adverse employment action, (3) she was qualified for the position, and (4) others, similarly situated and outside the protected class, were treated differently." Ondricko v. MGM Grand Detroit, LLC, 689 F.3d 642, 653 (6th Cir. 2012). As discussed above, if Richards successfully proves a prima facie case of discrimination, the burden of production shifts to CCCU to articulate some legitimate, nondiscriminatory reason for the employment decision. Id. If CCCU carries its burden, the burden of production shifts back to Richards to show that the legitimate reasons offered by the employer were not its true reasons, but rather were pretext for unlawful discrimination. Id.

The Court finds that Richards's discrimination claim must fail because Richards has not shown that she was treated differently to similarly situated persons outside of her protected class. The only allegation of differential treatment that the Court can find in Richards's filings comes from Richards's arguments made in the context of her ELCRA retaliation claim. There, Richards points to instances where other employees—"Marcy" and "Carrie"—were not fired for violating CCCU's confidentiality policies. Resp. at 15. But by Richards's own telling, each of these alleged incidents resulted in the accidental exposure of a single member's information. Richards Dep. at PageID.608–609. By contrast, Richards's alleged violation compromised the confidential data of

36 member accounts. See 10/13/22 Email (Dkt. 18-2) (internal CCCU email summarizing the number of accounts potentially compromised by data breach). These alleged incidents do not provide evidence that Richards was treated differently than others similarly situated outside of her protected class.

Because Richards cannot show that she was treated differently than a similarly situated employee outside of her protected class, she has not established a prima facie case of discrimination. CCCU is entitled to summary judgment on this claim.

### III. CONCLUSION

For the above reasons, the Court denies in part and grants in part CCCU's motion for summary judgment (Dkt. 14). The Court denies CCCU's motion with respect to Richards's claims of retaliation under the FMLA, hostile work environment under the ELCRA, and retaliation under the ELCRA. The Court grants CCCU's motion with respect to Richards's discrimination claim under the ELCRA.

SO ORDERED.

Dated: September 30, 2024　　　　　　　　s/Mark A. Goldsmith
　　　Detroit, Michigan　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　United States District Judge